U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

FILED

OCT 25 2012

CLERK, U.S. DISTRICT COURT
By _____
          Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| BNSF RAILWAY COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | NO. 4:11-CV-455-A |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND
ORDER

Before the court for decision are cross motions for summary judgment filed by plaintiff, BNSF Railway Company ("BNSF"), and defendant, United States of America.  The court has concluded that BNSF's motion should be granted and the government's denied.

I.

Nature of the Litigation

A.   The Refund Claims

This action was initiated on June 30, 2011, by the filing by BNSF, as plaintiff, of its Complaint seeking a refund from defendant, United States of America, of taxes plaintiff and its predecessors and affected employees paid to the Internal Revenue Service ("IRS") pursuant to the Railroad Retirement Tax Act, 26 U.S.C. §§ 3201-3214, ("RRTA") for the tax periods 1993 through 1998.  BNSF, which formerly was named "The Burlington Northern

and Santa Fe Railway Company," is the successor of the merger of Burlington Northern Railroad Company ("BNRR") and The Atchison Topeka and Santa Fe Railway Company ("ATSF").

BNSF's live pleading is an amended complaint it filed July 18, 2012, which United States answered July 31, 2012. BNSF seeks refunds of two categories of tax payments: The first are payments BNRR made for the tax years 1993, 1994, and 1995, ATSF made for the tax years 1994 and 1995, and BNSF made for the tax years 1996, 1997, and 1998 with respect to financial gains realized by their respective employees from the exercise by the employees of non-qualified stock options ("NQSOs") they had received as part of their benefits of employment,[1] and the second are payments BNRR made for the 1994 and 1995 tax years, ATSF made for the 1994 and 1995 tax years, and BNSF made for the 1996, 1997, and 1998 tax years with respect to moving and relocation expense benefits ("relocation benefits") received by their respective employees.[2] The total of the refunds sought by BNSF

---

[1]Over the years BNSF and its predecessors have recognized that the financial gains their officers and salaried employees realized from exercising NQSOs constituted compensation for income and FICA tax purposes. Thus, the controversy as to NQSOs in this action is limited to the question of whether BNSF and its predecessors should have made tax payments pursuant to the RRTA based on financial gains its officers and salaried employees realized from exercising NQSOs.

[2]Certain moving expenses BNSF and its predecessors provided as employee benefits were by virtue of the provisions of 28 U.S.C. § 3231(e)(5) excludable from "compensation" on which RRTA tax was to be paid. Those excludable benefits are not the subject of BNSF's refund claim.

as to the NQSO tax payments is $16,432,583.01 ($9,077,244.45, the employer portion; $7,355,338.56, the employee portion), and as to the relocation benefits tax payments is $5,603,294.08 ($1,068,633.71, the employer portion; $4,534,660.37, the employee portion).

B.   The Directly Pertinent Statutory Provisions

While the parties cite other statutory provisions in support of statutory construction arguments, the statutory provisions directly pertinent to the decisions to be made by the court are §§ 3201 and 3231(e) of Title 26, United States Code.  Section 3201 imposes a tax on the income of each railroad employee "equal to the applicable percentage of the <u>compensation</u> received during any calendar year by such employee for services rendered by such employee."  26 U.S.C. § 3201 (emphasis added).  The term "compensation" is defined in § 3231(e) to mean "any form of <u>money</u> remuneration paid to an individual for services rendered as an employee to one or more employers."  26 U.S.C. § 3231(e)(1) (emphasis added).  That definition is followed by a listing of things that are not included in the term "compensation."  One of the listed exclusions is

> an amount paid specifically--either as an advance, as reimbursement or allowance--for traveling or <u>other bona fide and necessary expenses incurred or reasonably expected to be incurred in the business of the employer</u> provided any such payment is identified by the employer

> either by a separate payment or by specifically
> indicating the separate amounts where both wages and
> expense reimbursement or allowance are combined in a
> single payment.

26 U.S.C. § 3231(e)(1)(iii)  (emphasis added).

C.   The Pretrial Order Stipulations

On September 27, 2012, the parties jointly filed a proposed
pretrial order in which they agreed that the court has
jurisdiction over all of BNSF's claims other than BNSF's claims
for refund with respect to relocation benefits for the years 1996
and 1997.  The court accepted and signed the proposed pretrial
order as a presentation by the parties of a joint definition of
the claims of the parties, stipulations of the parties, and joint
identification by the parties of contested issues of fact and
issues of law.  The parties jointly suggested in the pretrial
order that "this case can be fully resolved on the cross-motions
for summary judgment" and that "trial is unnecessary."  Pretrial
Order at 2, ¶ 2.  To that end, the parties jointly stated, with
specificity, the contentions of each party, following which the
parties provided stipulations of fact,[3] apparently with the

---

[3]Each party submitted in support of the party's motion for summary judgment a detailed twenty-seven-page set of stipulations of fact, which, when combined with the exhibits referenced in those stipulated facts, appears to accomplish essentially the same thing as the stipulations of fact contained in the proposed pretrial order. Pl.'s Mot. for Summ. J., App. at 2-27; Def.'s Mot. for Summ. J., App. at unnumbered pages 1-27. Other evidentiary items were provided to the court by each party in support of the party's motion for summary judgment. The court is considering those items and the statements of fact in the first set of stipulations as summary judgment evidence to the extent that they are not inconsistent

(continued...)

intent that there be no issue of fact to be resolved and that the disposition of the case will turn on pure legal issues, thus allowing for summary disposition on the cross-motions for summary judgment.

The facts to which the parties stipulated in the pretrial order included the following:

<u>Non-qualified Stock Options</u>

I.   Plaintiff paid the following amounts of RRTA taxes with respect to Plaintiff's employees' exercises of NQSOs:

| Year & Entity | Employer Portion | Employee Portion | Total |
|---|---|---|---|
| 1993 BNRR | $80,281.00 | $47,247.00 | $127,528 |
| 1994 BNRR | 187,474.61 | 132,544.62 | 320,019.23 |
| 1995 BNRR | 385,766.24 | 324,761.20 | 710,527.44 |
| 1994 ATSF | 479,203.72 | 434,290.85 | 913,494.57 |
| 1995 ATSF | 741,564.18 | 701,629.39 | 1,443,193.57 |
| 1996 BNSF | 3,213,390.91 | 2,602,105.72 | 5,815,496.63 |
| 1997 BNSF | 2,192,067.67 | 1,704,080.54 | 3,896,148.21 |
| 1998 BNSF | 1,797,496.12 | 1,408,679.24 | 3,206,175.36 |
| Total | | | $16,432,583.01 |

2.   Plaintiff properly and timely filed: (a) administrative refund claims with the Internal Revenue Service; and (b) this instant action with respect to the above claims.

3.   In general, a stock option is a contract whereby the employer promises to deliver to the optionee

---

[3](...continued)
with the later-made stipulations of fact.

employee shares of its stock upon exercise at the grant price.

4. Both Incentive stock options (ISOs) and NQSOs allow employees to purchase a stated number of shares of stock at a fixed price for a specified period of time.

5. During the years at issue, Plaintiff provided salaried employees with both incentive stock options (ISO) and non-qualified stock options (NQSO) pursuant to certain incentive stock option plans.

6. The stock options could be awarded as ISOs (nontaxable upon exercise for purposes of federal income tax) or NQSOs (stock options that did not qualify for ISO treatment). The stock options at issue in this suit are solely NQSOs.

7. In the years at issue, Plaintiff's board of directors and compensation committee determined the amount of stock options that would be granted to Plaintiff's employees pursuant to the applicable incentive stock option plans.

8. The stated purpose of these plans was to ensure that the employees were paid a competitive compensation package. While the average salary paid to its employees was below average in the industry, the overall compensation was above-average after taking into account the payment of stock options.

9. The Committee was authorized to specify both the final deadline for exercising stock options (which, according to the stock option plans, could be as long as 10 years after the grant of the option), and the vesting period applicable to each option grant, which governed the period of time that the employee was required to remain with the company before the option could be exercised. If the employee decided to exercise his stock option, he would pay the price for the share of stock that was the market price of the stock on the day the

stock option was granted, and would typically sell it for the stock's market price on the day of the exercise.

10.   In 90-95% of the stock options exercised the employee would receive a payment from First Chicago, BNSF's transfer agent, for the difference between the strike price and exercise price (the taxable amount) the same day.

11.   Plaintiff was a publicly traded company during the periods at issue.  The stock option exercises at issue concern stock that was publicly traded on the New York Stock Exchange during the periods at issue.

12.   Plaintiff's employees could exercise an option for as many shares as had been awarded per the option grant.  The employee's status as an executive or a non-executive governed certain procedures by which the exercise could be accomplished.  Executive level employees were authorized to exercise an option through a private broker, who would inform Plaintiff's compensation department that the employee had exercised a certain number of shares under a certain stock plan as of a stated date. The broker would also identify the method of exercise the employee had selected.  Non-executive level employees faxed or hand-delivered an exercise notification sheet to Plaintiff's compensation department, which also included the number of shares to be exercised, the option plan under which the exercise was occurring, the date on which the exercise was to occur and the method of exercise.

13.   In general, when Plaintiff's employee exercised an NQSO, the employee paid the strike price and received a share of stock with a fair market value higher than the option price.  The employee's ordinary income (as calculated under Code section 83) was the difference on exercise between the fair market value of the stock received and the option price (*i.e.,* the "spread on exercise").

7

14.   In the case of all option exercises, Plaintiff
      treated the difference between the total option
      price and the stock's value at exercise *(i.e.,* the
      spread on exercise) as income for federal income
      tax and RRTA tax purposes.

15.   In the same day sale and sale to cover exercises
      Plaintiff withheld federal income and employment
      taxes from the proceeds of the sale.

16.   Upon receipt of the exercise notice, Plaintiff
      then forwarded the notice of exercise to its
      transfer agent, First Chicago Trust of New York.
      First Chicago Trust of New York then:  (a) sold
      the number of shares exercised in a same-day-sale
      exercise and sent a check to plaintiff's employees
      for the proceeds of the sale, minus the option
      price and any taxes withheld; (b) in a sell-to-
      cover exercise, sold enough shares exercised to
      cover the total option price and/or the employee's
      total withholding tax liability (depending on the
      employee's instructions) and issued the remaining
      number of shares to the employee; or (c) in a cash
      purchase exercise, sent to Plaintiff a stock
      certificate for the amount of shares exercised,
      less any shares that were sold to cover any
      outstanding option cost or withholding tax
      liability (Plaintiff then forwarded the stock
      certificate to the employee or their broker).

17.   Under the stock option plans, Plaintiff could not
      require, direct or instruct the employee to keep
      or sell shares that the employee purchased through
      an option exercise.  That decision was the
      employee's alone.

18.   During the years at issue, 3,192 of Plaintiff's
      employees exercised NQSOs, resulting in
      $348,805,183.03 in total spread on exercise.

Relocation Benefits

19.  Plaintiff paid the following amounts of RRTA taxes
     with respect to relocation benefits:

| Year & Entity | Employer Portion | Employee Portion | Total |
|---|---|---|---|
| 1994 BNRR | $203,993.07 | $162,883.94 | $366,877.01 |
| 1995 BNRR | 296,033.59 | 259,878.42 | 555,912.01 |
| 1994 ATSF | 261,183.45 | 209,646.91 | 470,830.36 |
| 1995 ATSF | 307,423.60 | 223,366.57 | 530,790.17 |
| 1996 BNSF | | 1,474,611.60 | 1,474,611.60 |
| 1997 BNSF | | 1,238,832.71 | 1,238,832.71 |
| 1998 BNSF | | 965,440.22 | 965,440.22 |
| Total | | | $5,603.549.96[4] |

20.  Many of Plaintiff's employees were required to
     relocate during 1994 through 1998 for myriad
     reasons, including, but not limited to:
     consolidation and restructuring of operations, the
     merger of ATSF and BNRR, closing facilities or the
     promotion or transfer of an employee.  Such
     relocations were consistent with Plaintiff's goal
     of remaining competitive in the freight and
     transportation industry and were expected to occur
     given the changing needs of the company.
     Relocation benefits are a part of Plaintiff's
     total compensation benefits.

21.  Plaintiff provided moving and relocation expenses
     and expense reimbursements to its non-union or
     exempt employees as outlined in its employee
     relocation manuals and to its scheduled or union-
     member employees according to the applicable
     collective bargaining agreements (CBA).

---

[4]The total is incorrect as a result of an addition error.  The correct total is $5,603,294.08.

22.   Pursuant to these relocation policy manuals and collective bargaining agreements, relocation benefits were separate from the employee's salary and other compensation.

23.   The relocation benefits were provided to ensure that the employees and their families could afford to relocate and continue working for Plaintiff.

Pretrial Order at 19-23.

D.   The Contested Issues of Law

The parties jointly agreed in the pretrial order on the issues of law that would have to be resolved for there to be a summary adjudication as follows:

1.   Whether the NQSOs Plaintiff's employees exercised during the tax periods at issue are "compensation" as the term is defined in 26 U.S.C. § 3231(e)(1) (*i.e.,* "any form of money remuneration").

2.   Whether certain moving and relocation benefits provided to Plaintiff's employees during the tax periods at issue are "compensation" as the term is defined in 26 U.S.C. § 3231 (e)(1) (*i.e.,* "any form of money remuneration").

3.   Whether 26 U.S.C. § 3231(e)(1)(iii) applies to certain moving and relocation benefits at issue or whether § 3231 (e)(5) controls.

4.   Whether the attachments Plaintiff filed with its amended 1996 and 1997 employment tax returns satisfy the informal refund claim standard.

5.   In the event that the Court finds that 26 U.S.C. § 3231(e)(1 )(iii) may be applied to Plaintiff's moving and relocation expenses at issue, the parties have a legal disagreement about whether there is a substantiation requirement and, if so, whether the standard has been met.  Plaintiff contends that 26 U.S.C. § 3231(e)(1 )(iii) does

10

not contain a "substantiation" requirement as
Defendant argues.   Rather, because these expenses
were necessary to Plaintiff's business and were
reasonably expected to be incurred, Plaintiff has
satisfied the requirements of 26 U.S.C. §
3231(e)(1)(iii) (a provision which was codified
many years prior to Congress's adoption of
accountable plan rules applicable for purposes of
income taxes, income tax withholding and FICA
taxes).   Defendant contends, however, that
Plaintiff must substantiate its moving expenses
pursuant to the accountable plan rules or to rules
similar to the accountable plan rules.

Pretrial Order at 30-31.

E.   Potential Issues of Fact

The parties included under the heading "Agreed List of the

Contested Issues of Fact" in the pretrial order issues of fact

that will be presented only if certain legal rulings are made by

the court.   They are as follows:

1.   In the event that the Court finds that 26 U.S.C.
§ 3231(e)(1)(iii) may be applied to exclude
Plaintiff s moving and relocation expenses at
issue from RRTA, the parties have a legal
disagreement about whether 26 U.S.C. § 3231
(e)(1)(iii) has a substantiation requirement and,
if so, whether Plaintiff has met the
substantiation requirement.   Plaintiff contends
that there is no contested issue of fact since the
amount of RRTA taxes paid with respect to the
moving and relocation benefits have been agreed
upon by the parties.   Defendant, however, contends
that there is a contested issue of fact as to
whether Plaintiff has substantiated its expenses,
which include, *inter alia,* lump sum payments to
employees.   *See* Section H.5, below.   In the event
the Court finds that moving and relocation
expenses are only excludable from RRTA under

11

section 3231(e)(5), then Defendant's factual
contention is moot.

2.    In the event the Court finds that the in-kind or
      non-cash moving and relocation expenses are not
      compensation for purposes of RRTA under 26 U.S.C.
      § 3231(e)(1), Defendant contends that there is a
      contested issue of fact as to the amount of the
      expenses that make up the portion of the expenses
      made directly to the third-party relocation
      services providers (or the non-cash payments).  In
      the event the Court finds that all of the moving
      and relocation expenses at issue are not RRTA
      compensation under Code section 3231(e)(1 )(iii),
      or if the Court finds that moving and relocation
      expenses are only excludable from RRTA under
      section 3231(e)(5), then Defendant's factual
      contention is moot.

Pretrial Order at 29-30.

## II.

## Analysis

The main focus of BNSF's arguments in support of both

categories of its refund claims is on the use of the word "money"

in the statutory definition of "compensation" on which RRTA taxes

are to be paid.  BNSF argues that the term "money" is not

ambiguous, that the plain meaning of "money" is controlling in

determining what constitutes "compensation" for RRTA purposes,

and that the plain meaning of "money" includes only cash, coins,

or other mediums of exchange.  Thus, BNSF argues, the financial

gains realized by the employees from the exercise of their NQSOs

did not constitute "any form of money remuneration" subject to

RRTA taxes, nor, according to BNSF, are the relocation benefits subject to RRTA taxes because those benefits are not "any form of money remuneration" inasmuch as the payments made by BNSF and its predecessors were made directly to third parties on behalf of the employees and no "money" was paid by BNSF or its predecessors to the employees. BNSF adds as to the relocation benefits that they are excluded from "compensation" for RRTA purposes as "bona fide and necessary expenses incurred or reasonably expected to be incurred in the business of the employer." 26 U.S.C. § 3231(e)(1)(iii).

A.   The NQSOs Contentions

BNSF gave the following abbreviated description, which appears to be uncontested, of facts pertinent to the exercise by the employees of BNSF and its predecessors of their NQSOs:

> During 1993 through 1998, Plaintiff's employees exercised options and, pursuant to the governing agreements, purchased stock from Plaintiff. The undisputed facts further demonstrate that employees could chose to either keep the stock (as some did) or sell the stock on the open market and realize gain on the sale; under no circumstances did Plaintiff pay any money to employees for stock options or for shares of stock. An employee only received money if the employee sold shares of stock in the stock market to third-party purchasers. Whether a particular employee received any gain from the sale of a share of stock depended on the value of Plaintiff's shares in the open market at the time of sale.
>
> . . . When an option is exercised, the employee purchases shares of stock. The employee must take the

13

additional step of selling the stock on the open market
in order to obtain cash.  Any cash comes from a
purchaser in the open market, and is not payment by
that purchaser for any services rendered by the
employee. . . .

. . . .

. . . when the stock options were exercised, the
employee paid cash *to* Plaintiff and Plaintiff delivered
a share of stock pursuant to the terms of the stock
option plan but did not provide any employee with
money.  The employee could then choose to retain the
share or sell the share on the open market the same
day, which many did.  The decision to sell was always
independent of Plaintiff.  Even if stock was then sold
on the open market the day of exercise or at a later
date, Plaintiff never made a cash outlay to the
employee or otherwise paid money to the employee.
Instead, the party buying the stock on the open market
paid Plaintiff's employee for the value of the stock.

BNSF Reply Br. at 2-4 (footnotes and record references omitted).

Implicit in BNSF's argument is that the remuneration it and

its predecessors provided to their employees in the form of the

NQSOs was the option given to the employees to purchase at a

later date a specified number of shares of the employer's stock

at a specified price.  BNSF maintains that under no reasonable

reading of the "money remuneration" definition of "compensation"

for RRTA purposes can the conduct of the employees in exercising

those options be viewed to be "any form of money remuneration

paid to an individual for services rendered as an employee to one

or more employers."

The court concludes that BNSF's argument in support of its NQSOs refund request is persuasive. Defendant correctly responds that the grant of the stock options and benefits realized from the exercise of those options constitutes "compensation" in some sense of the word. For example, the Internal Revenue Code, while not recognizing that income is received upon grant of the option, treats the financial gain realized by the employee when the option is exercised as ordinary income to the employee. <u>Hope v. United States</u>, 803 F.2d 816, 818 (5th Cir. 1986). BNSF and its predecessors recognized that fact, and made whatever filings and payments were thereby required. But the court is not persuaded that the fact that the benefits realized by the employees when they exercised their NQSOs is compensation (ordinary income) for income tax or FICA purposes causes those benefits to be a form of "money remuneration" within the meaning of § 3231(e)(1).

Significant attention is given by the government to the words "any form of" that immediately precede the words "money remuneration" in the § 3231(e)(1) definition of the word "compensation." In effect, the government's argument is that anything of value received by an employee as a direct or indirect result of his employment is a "form of money remuneration paid to an individual for services rendered as an employee to one or more employers." The court does not agree that the words "any form

15

of" can reasonably lead to such a strained meaning of the "money

remuneration" words that follow.  The definition of "money,"

stated in its entirety, as found in Merriam-Webster's Collegiate

Dictionary is as follows:

> ¹**mon•ey** \'mə-në\ *n. pl* **moneys** or **mon•ies** \'mə-nëz\*often
> attrib* [ME *moneye.* fr. AF *moneta* mint. money — more at
> MINT] (14c) **1** : something generally accepted as a
> medium of exchange, a measure of value, or a means of
> payment: as **a** : officially coined or stamped metal
> currency **b** : MONEY OF ACCOUNT **c** : PAPER MONEY **2a** : wealth
> reckoned in terms of money **b** : an amount of money **c**
> *pl* : sums of money : FUNDS **3** : a form or denomination
> of coin or paper money **4 a** : the first, second, and
> third place winners (as in a horse or dog race) — usu.
> used in the phrases *in the money* or *out of the money*
> **b** : prize money ‹his horse took third ˜› **5 a** : persons
> or interests possessing or controlling great wealth
> **b** : a position of wealth ‹born into ˜› — **for one's
> money** : according to one's preference or opinion — **on
> the money** : exactly right or accurate

Merriam-Webster's Collegiate Dictionary 801 (11th ed. 2003).  The

only potentially pertinent parts of the definition are:  "**1** :

something generally accepted as a medium of exchange, a measure

of value, or a means of payment: as **a** : officially coined or

stamped metal currency **b** : MONEY OF ACCOUNT **c** : PAPER MONEY" and "**3** :

a form or denomination of coin or paper money."

Thus, the commonly accepted meaning of the words "any form

of money remuneration" could reasonably be thought to include

cash (whether coin or paper money or a combination of the two),

or a paycheck drawn on an account of the employer at a financial

16

institution, or a wire transfer of paycheck funds to the
employee's bank account, or scrip issued to an employee by an
employer for use at the employer's company store.  Nothing has
been called to the attention of the court to cause the court to
conclude that the grant of an option to an employee to buy the
employer's stock at a future date, for a specified amount, is a
form of money remuneration, or that the employee's financial gain
from a later exercise of such an option is a form of money
remuneration.  BNSF's contention as to the meaning of "money
remuneration" finds support in the "fundamental canon of
statutory construction [] that, unless otherwise defined, words
will be interpreted as taking their ordinary, contemporary,
common meaning."  Perrin v. United States, 444 U.S. 37, 42 (1979)
(citing Burns v. Alcala, 420 U.S. 575, 580-81 (1975)).  There is
no "ordinary, contemporary, common meaning" of the words "money
remuneration" that would include receipt by an employee of an
NQSO or the financial gain realized by such an employee from a
later exercise of the option.

Nor is the court persuaded by the government's contention
that there is an ambiguity in § 3231(e)(1) that authorized IRS to
provide clarification by issuance of a regulation, and that the
answer to the true meaning of "money remuneration" is found in
the Treasury Regulation at 26 C.F.R. § 31.3231(e)-1(a)(1), which

17

says, _inter alia_, that "[t]he term _compensation_ has the same

meaning as the term _wages_ in section 3121(a) . . ., except as

specifically limited by the Railroad Retirement Tax Act . . . ."

The government has two problems with this contention.  First, the

court disagrees with the government's argument that "money

remuneration" is ambiguous in the sense that the court is

obligated to accept IRS's regulatory interpretation even if it

goes against the commonly understood meaning of the term, as it

would here if the regulation meant what the government says it

does.  A similar argument was made by the government, in a

different context, and rejected by the Fifth Circuit in Lion

Health Services, Inc. v. Sebelius, 635 F.3d 693, 699-700 (5th

Cir. 2011).  As the Fifth Circuit instructed in Lion Health, when

Congress directly spoke to the precise question in issue,

requiring in the instant action that the remuneration be a "form

of money remuneration," the court must give effect to that

unambiguously expressed intent.  Secondly, the wording of

Regulation § 31.3231(e)-1(a)(1) does not, in any event, support

the government's position.  As noted above, the statement in

§ 31.3231(e)-1(a)(1) that the term "compensation" has the same

meaning as the term "wages" in § 3121(a) has an exception for any

special limitation found in RRTA.  Needless to say, the special

definition of "compensation" found in the RRTA that the term

means only a "form of <u>money remuneration</u> paid to an individual for services rendered as an employee to one or more employers," 26 U.S.C. § 3231(e)(1) (emphasis added), is a controlling special limitation.  The court rejects the government's attempt to play a definitional shell game by substituting the 26 U.S.C. § 3121(a) definition of the term "wages" for the 26 U.S.C. § 3231(e)(1) definition of the term "compensation."  The § 3121(a) definition says that "the term 'wages' means <u>all remuneration</u> for employment" (emphasis added), whereas, in contrast, the § 3231(e)(1) definition limits the meaning of the term "compensation" drastically by substituting the word "money" for the word "all" in front of the word "remuneration."

The government attaches decisive significance to the fact that in 2004 Congress amended the RRTA to add 26 U.S.C. § 3231(e)(12), a subsection that specifically excludes incentive stock options (ISOs) (as defined in 26 U.S.C. § 422(b)) from the RRTA definition of "compensation."[5]  BNSF responds by pointing to the distinctions between NQSOs and ISOs, noting that (1) the act

---

[5]Section 3231(e)(12) reads as follows:
   (12) **Qualified stock options**
        The term "compensation" shall not include any remuneration on account of--
             (A) a transfer of a share of stock to any individual pursuant to an exercise of an incentive stock option (as defined in section 422(b)) or under an employee stock purchase plan (as defined in section 423(b)), or
             (B) any disposition by the individual of such stock.
26 U.S.C. § 3231(e)(12).

of disposing of stock (and receiving cash on such sale) within
one year after the exercise of an ISO is the event that triggers
taxable income pursuant to 26 U.S.C. § 421(b), whereas, in
contrast, NQSOs are taxable at exercise, when no cash is
transferred by the employer, and (2) that under the ISO statute,
there can be cash associated with the exercise of an ISO (which
must be arranged for in an ISO agreement, referencing 26 U.S.C.
§ 422(c)(4)(B) and 26 C.F.R. § 1.422.5(c)), whereas, in contrast,
cash cannot be provided to the employee by the employer upon
exercise of an NQSO because such a payment would create a
"discounted option," which would violate 26 U.S.C. § 409A.  As a
consequence of those distinctions, BNSF contends, the addition of
the § 3231(e)(12) exclusion was necessary to insure that benefits
from ISOs not be included as "money remuneration" subject to the
RRTA tax, and was not indicative of congressional intent that
NQSOs be embraced by the "any form of money remuneration"
language in § 3231(e)(1).  The court is inclined to agree with
BNSF on this point.

While resort to legislative history is not necessary for a
resolution of the NQSO refund issues, the court does note that
the history described by BNSF in its summary judgment documents
of railroad pension systems and RRTA compensation lends support
to BNSF's reading of 26 U.S.C. § 3231(e)(1).  Railroads had

20

private pension systems for its employees for many years prior to the enactment of the RRTA in 1937. The pensionable compensation in the private systems did not include non-money items like stock or stock options, even though railroads had been offering their employees stock purchase plans long before 1937. When the RRTA was enacted, there was no indication that stock or stock options were to be included in RRTA compensation. Rather, the indication was that Congress chose to follow the prior private railroad pension system by limiting RRTA compensation to an employee's hourly pay, commissions, and bonuses. Summed up, the history of the railroads' pension systems indicates that the term "compensation," as used in the RRTA, was never intended to include stock or stock options such as the NQSOs at issue in the instant action.

For the reasons given above, the court has concluded that BNSF's refund claims as to the RRTA tax payments it and its predecessors made during the tax years at issue are meritorious, and should be honored by the government, and that BNSF's motion for summary judgment should be granted and the government's denied as to those refund claims.

B.   <u>The Relocation Benefits Contentions</u>

Included in the agreed Pretrial Order are the following explanations of BNSF's contentions concerning the relocation benefits:

> The relocation benefits were not related to the employee's provision of services to Plaintiff.  Rather, the relocation benefits were provided to ensure that the employees and their families could afford to relocate and continue working for Plaintiff.  Without trained and qualified employees, Plaintiff (or any business) could not continue to operate.  That is, the moving of the employees and the payment of the benefits were reasonably expected to be incurred and were necessary to Plaintiff's business.

> Once the decision to relocate certain operational centers and the affiliated employee groups was made, Plaintiff identified the affected employees.  Plaintiff then ran relocation cost estimates on the affected employees to measure the potential financial outlay that such relocations would require.  Next, the affected employee's department contacted the employee with an offer to relocate to the new operational center.  The human resources department also informed the employee about the terms of any relocation assistance Plaintiff would provide, consistent with the Plaintiff relocation policy manual or the Plaintiff collective bargaining agreement that covered the respective employee.

> Once the employee agreed to the relocation, the human resources department processed the authorization through approval by the affected employee's department head.  The human resources department next contacted the third party relocation service vendor.  Following notice of a pending relocation, the relocation services company contacted the affected employee to explain the relocation assistance that was available to the affected employee per the terms of the Plaintiff relocation policy manual or Plaintiff's collective

> bargaining agreement that covered the respective
> employee.
>
> The relocation benefits Plaintiff provided its
> employees covered only reasonable moving and relocation
> expenses.  The available benefits were based on
> relocation cost benchmarking surveys prepared by
> Plaintiff's relocation services company and other
> third-party advisors, and collective bargaining
> negotiations with Plaintiff's respective labor
> organizations.

Pretrial Order at 11-12.  The accuracy of those contentions is

verified by the declaration of Mark Premock, which was provided

to the court in support of BNSF's motion for summary judgment.

BNSF's Mot. for Summ. J., App. at 1705-11.

BNSF first argues that the relocation benefits are not

subject to RRTA taxes because they are not a form of "money

remuneration."  However, the court has concluded that it does not

need to address that contention, and that the outcome of the

relocation benefits controversy can readily be resolved on the

basis of BNSF's alternative contention that the language found at

26 U.S.C. § 3231(e)(1)(iii) that excludes "bona fide and

necessary expenses incurred or reasonably expected to be incurred

in the business of the employer" from "compensation" for RRTA

purposes applies to the relocation benefits.  Four of the

stipulations of fact reached by the parties were as follows:

> 20.   Many of Plaintiff's employees were required
>       to relocate during 1994 through 1998 for
>       myriad reasons, including, but not limited

to: consolidation and restructuring of operations, the merger of ATSF and BNRR, closing facilities or the promotion or transfer of an employee. Such relocations were consistent with Plaintiff's goal of remaining competitive in the freight and transportation industry and were expected to occur given the changing needs of the company. Relocation benefits are a part of Plaintiff's total compensation benefits.

21. Plaintiff provided moving and relocation expenses and expense reimbursements to its non-union or exempt employees as outlined in its employee relocation manuals and to its scheduled or union-member employees according to the applicable collective bargaining agreements (CBA).

22. Pursuant to these relocation policy manuals and collective bargaining agreements, relocation benefits were separate from the employee's salary and other compensation.

23. <u>The relocation benefits were provided to ensure that the employees and their families could afford to relocate and continue working for Plaintiff</u>.

<u>Supra</u> at 9-10 (emphasis added). Thus, there seems to be agreement between the parties that the relocation expenses were "necessary expenses incurred or reasonably expected to be incurred in the business of the employer." The court takes the term "bona fide," in the sense used in the statute, to mean actually, or in reality, incurred. The parties included in their stipulations that plaintiff paid $5,603,294.08 as RRTA taxes with respect to relocation benefits. There is no suggestion that any of those relocation benefits were not benefits actually or in

reality provided for the employees in connection with employee relocations required by the business of the employer.

The court concludes that the attachments BNSF filed with its amended 1996 and 1997 employment tax returns satisfy the informal refund claim standard, and that BNSF has satisfied its summary judgment burden to establish that the relocation benefits in question were necessary to the business of BNSF and its predecessors and were reasonably expected by them to be incurred. Thus, plaintiff has satisfied the requirements of § 3231(e)(1)(iii). Consequently, the court has concluded that the potential issues of fact defined in the pretrial order, <u>supra</u> at 11-12, are not genuinely disputed facts that would prevent the granting of BNSF's motion for summary judgment as to the relocation benefits refund claims.

Therefore, the court concludes that the relocation benefits were not compensation as that term is defined in the RRTA, that the RRTA tax payments by BNSF and its predecessor on those benefits were improperly made, that BNSF's refund claims as to those tax payments should be honored by the government, and that BNSF's motion for summary judgment should be granted, and the government's denied as to those refund claims.

C.    Conclusion

For the reasons stated in the foregoing memorandum opinion, the court has concluded that the motion for summary judgment of BNSF should be, and it is hereby, granted, and that the motion for summary judgment of the government should be, and it is hereby, denied.

The court expects the parties to reach agreement as to the form of final judgment to be signed and entered on the basis of the rulings made in this memorandum opinion and order.   To that end, the court ORDERS the parties, through counsel, to confer relative to the form of final judgment, and to submit jointly to the court by filing, with an appropriate cover document, by 4:00 p.m. on November 5, 2012, a form of final judgment that would reduce to judgment form the rulings made herein.

THE COURT SO ORDERS.

SIGNED October **25**, 2012.

JOHN McBRYDE
United States District Judge

26